**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **THE HONORABLE RICK PERRY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **NEWT GINGRICH, JON HUNTSMAN,** | § | |
| **JR., and RICK SANTORUM** | § | |
| | § | |
| **Intervernor-Plaintiffs** | § | |
| | § | |
| **v.** | § | **Civil No. 3:11-CV-856** |
| | § | |
| **CHARLES JUDD, KIMBERLY** | § | |
| **BOWERS, and DON PALMER, members** | § | |
| **of the Virginia Board of Elections, in their** | § | |
| **official capacities, and PAT MULLINS, in** | § | |
| **his official capacity as Chairman of the** | § | |
| **Republican Party of Virginia,** | § | |
| | § | |
| **Defendants.** | § | |

**BRIEF OF PLAINTIFF, HONORABLE RICK PERRY**

Plaintiff, the Honorable Rick Perry, by counsel, states as follows for his brief on the three

issues requested by the Court.

**Introduction and Summary of the Argument**

The Commonwealth of Virginia, through the Virginia Board of Elections, and as applied

by the Republican Party of Virginia,[1] has required a candidate of a political party to file with the

State Board of Elections, 10,000 signatures of qualified voters in order to be on the Republican

primary ballot for the office of President of the United States.

---

[1] Section 24.2-545(B) of the Code of Virginia states: "Any person seeking the nomination of the national political party for the office of President of the United States,…, *may* file with the State Board petitions signed by at least 10,000 qualified votes…" VA. CODE ANN. § 24.2-545.  Oddly, it is not an actual requirement, though it is being applied as if it is mandatory.

The central questions to this case are: (1) whether the requirement that petition circulators be Virginia residents who are eligible to vote is a narrowly tailored restriction on the First and Fourteenth Amendments designed to serve a compelling state issue; (2) whether this action by Plaintiff is timely; and (3) what is the remedy.

The Court need only consider the constitutional issues in the first question if it deems the statutory language of § 24.2-545(B) mandates the filing of petitions.  Use of the word "may," however, clearly states the legislature's intent to make optional or permissive the filing of petitions when seeking a ballot position for the office of President of the United States.  § 24.2-544(B); *see Zinone v. Lee's Crossing Homeowner's Ass'n.*, 714 S.E.2d 922, 925 (Va. 2011).

In a case decided by the Virginia Supreme Court only four months ago, the Court interpreted legislative intent regarding use of the words "shall" and "may" in statutory language in *Zinone*.  It reasoned:

> "We look to the plain meaning of the statutory language, and presume that the legislature chose, with care, the words it used when it enacted the relevant statute." . . .  Moreover, when the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional.

*Id*. at 925 (citations omitted) (quoting *Addison v. Jurgelsky*, 704 S.E.2d 402, 404 (Va. 2011) (citations and internal quotation marks omitted)).

Because the clear language of § 24.2-545(B) is permissive as to filing any petitions, the Defendants have misapplied the statute and wrongfully denied Governor Perry a position on the ballot for office of President of the United States in the Republican Primary.[2]  The Court needs to consider the constitutional issues regarding restrictions on ballot circulators only if any petition

---

[2] The Court may reach its decision on this basis alone and issue its mandate remedying this misapplication as to all plaintiffs who asked to be put on the ballot.  The Court need not rule further on the questions relating to the process and numerosity of the petitions.

requirement exists in Virginia law regarding the office of President of the United States.  If ballot circulation restrictions are applicable in this case, those restrictions directly limit First Amendment rights of free speech and freedom of association.  *See Buckley v. Am. Constitutional Law Fund*, 525 U.S. 182, 186 (1999); *Meyer v. Grant*, 486 U.S. 414, 426-28 (1988).

When a state regulation severely restricts First Amendment rights, the burden is *on the government* to prove that the restriction is narrowly tailored to serve a compelling government interest.  *See Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 898 (2010); *see also Meyer*, 486 U.S. at 428 (law at issue "impose[d] a burden on political expression that *the State . . . failed* to justify" (emphasis added)); *Buckley*, 525 U.S. at 195.  The burden is on the government even at the preliminary injunction stage because "the burdens at the preliminary injunction stage track the burdens at trial."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (observing the Court in *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004) appropriately granted a preliminary injunction "where *the Government* had failed to show a likelihood of success under the compelling interest test" (emphasis added)).

To satisfy its burden, a state must provide more than speculative, categorical answers. *See Gonzales*, 546 U.S. at 430-31 (strict scrutiny is not satisfied by a "categorical approach," but rather, requires a case-by-case determination of the question).  In other words, the government "must do more than simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994) (citation and internal quotation marks omitted); *see also Meyer*, 486 U.S. at 426 (refusing to accept state's bald argument that paid circulators might be more tempted to cheat than volunteer circulators where the state offered "[n]o evidence . . . to support that

speculation").

Virginia cannot meet its burden regarding the petition requirements placed upon a candidate to be on a political party's primary ballot for the office of President of the United States. The statute is facially defective in that five of the seven nationally recognized candidates for office were excluded from the ballot.[3] *See Lubin v. Parrish*, 415 U.S. 709, 715 (1974) (State has legitimate interest in preventing laundry list ballots; but process which limits ballot access to legitimate candidates gives rise to constitutional questions)..)

Virginia's requirement that petition circulators be eligible to vote in Virginia is an unwarranted restriction on the number of political message carriers.[4] There is no legitimate state interest served by this restriction on First Amendment rights.

Governor Perry timely sought injunctive relief at the time actual injury occurred. To have brought this suit before he was declined a position on the ballot would have only presented the Court with a hypothetical issue, and subjected the claim to a ripeness defense. *See Texas v. United States*, 523 U.S. 296, 300-02 (1998).

When a civil rights violation has occurred, as in this case, the Court should fashion a remedy placing the plaintiff in a position as if the violation had not occurred. Accordingly, the only appropriate remedy is for this Court to issue an order mandating the Defendants place Governor Perry on the Republican primary ballot for the office of President of the United States. *See McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (requiring a candidate be placed on the

---

[3] Congresswoman Michele Bachmann has now suspended her candidacy.

[4] Governor Perry, himself, is prohibited from circulating petitions. Va. Code § 24.2-545(B) as implemented by the State Board of Elections. If each of the 50 states, the District of Columbia, Puerto Rico, and other U.S. territories which participate in the primary process had Virginia's identical requirements, it would be unrealistic for even one national candidate to be on all the ballots in every jurisdiction.

ballot).

**Argument**

I.    **Virginia's residency/eligibility requirement for petition circulators creates a burden on political expression Virginia cannot justify.**

States have advanced three primary interests in support of state-residency requirements for circulators. First, states have suggested the residency requirements serve the state's police interest by ensuring that petition circulators will be amenable to the state's subpoena power. Second, states have suggested circulator-residency requirements serve the state's interest in protecting the integrity of the electoral process. Finally, states have affirmed they have an interest in ensuring that only district voters are allowed to influence district politics. Whether or not these interests are compelling, the Commonwealth cannot show that its residency requirement is narrowly tailored to any of them. Therefore, Plaintiffs have likely success on the merits.

     A.    **The district-residency requirement is not narrowly tailored to the Commonwealth's interest in ensuring that petition circulators are subject to the Commonwealth's subpoena power.**

In defense of state-residency requirements, states have suggested that such a requirement is necessary to ensure that petition circulators are amenable to the state's subpoena power. *See, e.g.*, *Buckley*, 525 U.S. at 196. Because the state-residency requirement is not narrowly tailored to serve this interest, it is unnecessary to decide whether this interest is compelling, a point which is itself debatable. *Compare Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 n.3 (10th Cir. 2008) ("far from clear" that the ability to question circulators "significantly *aids*" in protecting the integrity of the electoral process), *with Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001) (state-residency requirement

5

compelling).

There are at least two reasons why the statute here is not narrowly tailored to the Commonwealth's subpoena power interest.  First, the statute is not narrowly tailored in that the Commonwealth's subpoena power extends beyond its borders, provided that the subpoena is related to activities that occurred within its borders.  *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 882 (3d Cir. 1997).  A law authorizing the issuance of a subpoena over anyone that circulated a petition is a far more direct method of serving the state's interest and excludes few, if any, from the class of potential petition circulators.

Second, the statute is not narrowly tailored because the Commonwealth could advance its interest more narrowly by requiring circulators to agree to answer a subpoena as a condition of petition circulation.  The requirement could appear along with the witness affidavit on the petition form itself, and the Commonwealth could impose criminal penalties for failure to appear.  Courts have consistently noted that imposing such a condition on petition circulators is one way for states to address their subpoena-power interest in a narrowly tailored fashion.  *See, e.g.*, *Yes on Term Limits, Inc.*, 550 F.3d at 1030 (state could provide criminal penalties for circulators who failed to answer consented-to subpoena); *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008) ("[C]ourts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement"); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236, 1242-44 (10th Cir. 2002) (city-residency require-ment was "substantially broader than necessary" in part because city could require circulators to agree to submit to jurisdiction as a prerequisite to circulating petitions); *Krislov v. Rednour*, 226 F.3d 851, 866 n.7 (7th Cir. 2000) (invalidating residency requirement and suggesting agreement to submit to jurisdiction as permissible restriction to address state's interest in

preventing fraud).

To the extent the state-residency requirement merely facilitates the prosecution of lawbreaking circulators by furnishing the Commonwealth with the circulator's location, it is not narrowly tailored to serve that purpose either.  The Commonwealth already requires each petition circulator to provide, under penalty of perjury, her name and address.[5]  This disclosure is sufficient to serve the Commonwealth's policing interest, for if and when the Commonwealth discovers fraudulent activity by a circulator, the circulator's notarized submission – available to law enforcement officers – gives it ample information to locate the offending circulator, and to investigate and prosecute any violations.[6]

The state-residency requirement is, therefore, not narrowly tailored to achieve any state interest in policing lawbreaking circulators.

**B.      The state-residency requirement is not narrowly tailored to serve the Commonwealth's interest in protecting the integrity of the electoral process.**

States have also asserted that circulator-residency requirements are necessary to protect the integrity of the electoral process.  *See, e.g.*, *Krislov*, 226 F.3d at 865.  Specifically, states have argued that residency requirements increase the probability that only valid signatures will be collected.  Like the states' policing interest, however, it makes no difference whether the integrity-of-the-process interest is classified as compelling, because the state-residency requirement is not narrowly tailored to serve the interest.

---

[5] The petition form itself indicates that the penalty for "falsely signing this affidavit" is a maximum fine of $2,500, imprisonment up to ten years, or both. *See* VA. CODE ANN. § 24.2-1016 ("Any willfully false material statement or entry made by any person in any statement, form, or report required by this title shall constitute the crime of election fraud and be punishable as a Class 5 felony.").

[6] Indeed, the Commonwealth recently prosecuted two petition circulators for perjury, voter fraud and false statement on the form, both felonies.  *See….. http://voices.washingtonpost.com/crime-scene/arlington/two-indicted-on-voter-fraud-in.html.*

As a threshold matter, it is not entirely clear *how* the state-residency requirement ensures that only valid signatures are collected. *See, e.g.*, *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 150 (2d Cir. 2000) (government "failed to suggest *any* meaningful relationship" between the residency requirement and government's interest in "protecting the integrity of the signature collection process"). Virginia already addresses, by other means, its interest in ensuring that only valid signatures are counted. For instance, all circulators are required to sign an affidavit on the petition form itself stating that they personally witnessed each signature on the petition. Falsely signing the affidavit subjects the circulator to potential criminal penalties, including up to ten years imprisonment. *See* VA. CODE ANN. § 24.2-1016. Unlike these legitimate provisions, however, the state-residency requirement simply does not advance the Commonwealth's interest in ensuring that only valid signatures are counted. *See Meyer*, 486 U.S. at 426-27 (noting that "[o]ther provisions" of Colorado law expressly addressed the potential danger that circulators "might be tempted to pad their petitions with false signatures").

Another justification that states have advanced is that residency restrictions protect the electoral process by increasing the likelihood that circulators have "some familiarity with persons who sign petitions." *See, e.g.*, *Lerman*, 232 F.3d at 150 (internal quotation marks omitted). This asserted justification is a direct, unwarranted limitation on free speech and freedom of association in that it seeks to limit political discussions to those individuals known by the circulator. Again, given the size of the Commonwealth, requiring petition circulators to be residents of the state does not necessarily serve this interest. In short, there is no apparent basis for concluding that resident-circulators are any more (or less) trustworthy, honest, or forthright than their neighbors in other states. *Cf. Meyer*, 486 U.S.

at 426 ("[W]e are not prepared to assume that a professional circulator . . . is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.").

Therefore, the state-residency requirement is not narrowly tailored to serve the Commonwealth's interest in protecting the integrity of its electoral process. *See Buckley*, 525 U.S at 651; *Krislov*, 226 F.3d at 863-66; *Lerman*, 232 F.3d at 149; *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002); *see also Bogaert v. Land*, 572 F. Supp. 2d 883 (W.D. Mich. 2008), appeal dismissed, 543 F.3d 862 (6th Cir. 2008).

### C. The state-residency requirement cannot be supported by an interest in allowing only state voters to influence state politics.

States have also argued that residency restrictions are a necessary means to advance their interest in ensuring that only state voters are allowed to influence state politics. *See, e.g.*, *Krislov*, 226 F.3d at 865. This argument conflates a state's legitimate interest in ensuring that state residents alone are permitted to *select and elect* their representatives, with the wholly illegitimate interest of *banning non-resident political speech.* Because Virginia's state-residency requirement advances only the latter, illegitimate interest, it cannot survive strict scrutiny.[7]

Only those signatures on the petition form are counted, and only residents are permitted to sign the petition form (non-resident signatures are not counted). So there is no apparent

---

[7] To the extent the Commonwealth contends that it has an interest in ensuring that only state residents are permitted to *select and elect* their representatives, Plaintiffs agree. *See Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 282 n.13 (1985) ("A State may restrict to its residents, for example, both the right to vote, and the right to hold state elective office." (citation omitted)); *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978) ("[A] government unit may legitimately restrict the right to participate in its political processes to those who reside in its borders."). But that valid interest is fully protected by several other provisions of Virginia law. Specifically, Virginia prohibits non-state residents from signing petitions, voting in primary elections, and voting in the general election. VA. CODE ANN. §§ 24.2-506 (only qualified voters may sign candidate petitions); 24.2-101 (qualified voter must be a resident of the Commonwealth and of the precinct in which he offers to vote); 24.2-400 (a qualified voter who is registered to vote is "entitled to vote in the precinct where he resides"); 24.2-530 (who may vote in primary).

reason why the circulator must also be a state resident, *unless* the real interest advanced by the law is to "help… prevent non-residents from influencing politics within the [state]." *See Lerman*, 232 F.3d at 152. Such an interest, the Second Circuit observed, "does not appear to be legitimate at all." *Id.*; *see also Krislov,* 226 F.3d at 866 ("question[ing the] legitimacy" of a state's interest in "preventing citizens of other States from having any influence" on its elections). The Second Circuit explained: "A desire to fence out non-residents' political speech – and to prevent both residents and non-residents from associating for political purposes across district boundaries – simply cannot be reconciled with the First Amendment's purpose of ensuring 'the widest possible dissemination of information from diverse and antagonistic sources.'" *Lerman,* 232 F.3d at 152 (quoting *Krislov*, 226 F.3d at 866); *Warren v. Fairfax County*, 196 F.3d 186,189-90 (4th Cir. 1999) (invalidating law that prohibited non-residents from using a public forum to "engage in First Amendment activity").[8]

## II.    Governor Perry was diligent in seeking redress and, therefore, his claim is not barred by laches.

In asserting the equitable defense of the doctrine of laches, Defendants must demonstrate they were prejudiced by Plaintiff's unreasonable delay in pursuing his rights or claims. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). In this pre-election suit, Plaintiff diligently pursued his efforts to comply with Virginia's unconstitutional election laws. Governor Perry

---

[8] If, indeed, preventing non-state residents from having any influence on state politics were recognized as a legitimate (or rather, compelling) state interest, the Commonwealth could do much more than require circulators to be state residents. *See Yes on Term Limits,* 550 F.3d at 1029 n.2 (rejecting state's purported interest in "restricting the process of self-government to members of its own community" and adding that to accept such an interest would have "far-reaching consequences" (internal quotation marks omitted)). Under the same premise, Virginia could prevent all non-resident citizens from campaigning on behalf of any candidate for office. Or, it could ban radio and television ads that promote the election or defeat of candidates, if such ads were funded or created by non-residents. *See id.* (surmising that if the court were to accept such an interest, the state could also, by logical extension, validly prohibit non-residents from "driving voters to the polls"). These are clearly illegitimate restrictions on free speech and demonstrate the absurdity of precluding non-resident political speech.

suffered an injury-in-fact when he was denied a position on the Republican primary ballot on December 23, 2011.  He sought declaratory and injunction relief on December 27, 2011 just four (4) days after he was informed he did not meet the petition requirements to be on the ballot.[9]

The failure of Governor Perry to have made the same claim before the date on which signature petitions were due does not give rise to the defense of laches.  Laches simply does not apply as a defense before a claim is ripe.  *See, e.g.*, *Public Citizen v. Miller*, 813 F. Supp. 821 (N.D. Ga. 1993), aff'd 992 F.2d 1548 (11th Cir. 1993) (per curium).  Accordingly, Governor Perry did not have a ripe claim until he was denied ballot access and thereby suffered an actual harm.  *See Texas*, 523 U.S. at 300 ("[A] claim is not ripe if it rests upon '"contingent future events that may not occur . . . ."'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581 (1985) (quoting 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532, p. 112 (1984)) (quotation marks omitted)).

Plaintiff's requested relief does not prejudice Defendants.  Instead, the denial of the relief requested by Plaintiff will prejudice and abridge both Plaintiff's and the Virginia voters' constitutional rights.  Such violations of Plaintiff's and the Virginia voters' constitutional rights should not go unremedied.  *See McCarthy*, 429 U.S. at 1322 (ordering a candidate's name to be placed on the ballot as the remedy after the candidate's constitutional rights were violated).

"Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).  "Where there has been no inexcusable delay in seeking a remedy and

---

[9] Those days included Christmas Eve, Christmas Day and the generally recognized national holiday of December 26th in which the federal courthouse was closed and on which an original complaint could not have been filed.

where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief." *Gardner v. Panama R. Co.*, 342 U.S. 29, 31 (1951).

### A.      Plaintiff was diligent.

"The first element of laches—lack of diligence—exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *White*, 909 F.2d at 102 (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987); citing *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966); *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 (5th Cir. 1985)). The evidence in this case establishes Plaintiff attempted to comply with Virginia's unconstitutional voting laws and did not sit on his rights after it became clear he would not be placed on the ballot.

After receiving notice his name would not be placed on the ballot, Plaintiff filed this suit four days later.  Accordingly, Plaintiff cannot be charged with a lack of diligence in enforcing his rights.  *See Smith v. Bd. of Election Comm'rs for the City of Chicago*, 587 F. Supp. 1136, 1142 (N.D. Ill. 1984) (holding three candidates could not be charged with a lack of diligence prior to submitting their signatures because they may well have expected to be able to comply with the applicable statute); *see also McCarthy*, 429 U.S. at 1322 (overruling finding of laches defense).[10]

### B.      Defendants are not prejudiced.

"The second element—prejudice to the defendant—is demonstrated by a disadvantage on

---

[10]   In *McCarthy*, the state argued that it was too late to add the candidate's name to the statewide ballot and the District Court and Court of Appeals denied relief on the basis of laches. *See McCarthy v. Briscoe*, 418 F. Supp. 816, 818 (W.D. Tex. 1976) (subsequent history omitted); *McCarthy v. Briscoe*, 539 F.2d 1353, 1354-55(5th Cir. 1976) (subsequent history omitted).  However, Mr. Justice Powell wrote for the Supreme Court: "This Court will normally accept findings of a district court affirmed by a court of appeals, on factual consideration such as those underlying a determination of laches.  But acceptance of findings of fact does not, in this case, require acceptance of the conclusion that violation of the applicants' constitutional rights must go unremedied." *Id.* at 1322.  The Supreme Court then ordered the candidate's name be added to the ballot. *McCarthy*, 429 U.S. at 1323.

the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." *White*, 909 F.2d at 102 (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982). In this case, the only prejudice Defendants might suffer is their inability to enforce Virginia's unconstitutional election laws. Defendants have taken no affirmative action to which they can allege to have been prejudiced.

Further, the ballots for the election have not been printed, and are not due under current Virginia law to be mailed until January 21, 2012—45 days prior to the election. *See* VA. CODE ANN. § 24.2-612. If Defendants proceed to print ballots without Plaintiff's name before this Court makes its ruling, any prejudice and damage caused by having to reprint the ballots after this Court makes a ruling will be of Defendants' own making.

Plaintiff has been diligent in seeking redress for the violations of his constitutional rights by filing suit just days after failing to secure the unconstitutionally high number of signatures required to be placed on Virginia's ballot. Further, Defendants cannot demonstrate any prejudice from the timing of Plaintiff's suit. Equity clearly favors Plaintiff, and Defendants' defense of laches should be denied. *McCarthy*, 429 U.S. at 1322-23.

### III.    The remedy the Court should mandate is to place Governor Perry on the Republican primary ballot for the office of President of the United States.

The only remedy available to this Court is to place the Plaintiff's name on the ballot. In the analogous case of *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006, 1015 (S.D. Ohio 2008), the district court wrote:

> To remedy the unconstitutional ballot access procedures in Michigan, the Court of Appeals affirmed the district court's order placing Plaintiff Goldman-Frankie's name on the ballot. As instructed by the Supreme Court in *McCarthy v. Briscoe*,

13

429 U.S. 1317, 1323, 97 S.Ct. 10, 50 L.Ed.2d 49 (U.S. 1976), "[i]n determining whether to order a candidate's name added to the ballot as a remedy for a State's denial of access, a court should be sensitive to the State's legitimate interest in preventing 'laundry list' ballots that 'discourage voter participation and confuse and frustrate those who do participate.'" *Quoting Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).    But where a state has unconstitutionally prevented a party or a candidate from accessing the ballot, "a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support." *See McCarthy v. Briscoe*, 429 U.S. at 1323, 97 S.Ct. 10.

The Constitution gives the Ohio legislature significant discretion to establish election procedures.    After the state statute was held to fall outside "the boundaries established by the Constitution," the legislature failed to act. *Blackwell*, 462 F.3d at 595.  The Court will not prescribe Constitutional election procedures for the state, but in the absence of constitutional, ballot access standards, when the "available evidence" establishes that the party has "the requisite community support," this Court is required to order that the candidates be placed on the ballot.  *McCarthy*, 429 U.S. at 1323, 97 S.Ct. 10.  As set out above, the Court finds that the Libertarian Party has the requisite community support to be placed on the ballot in the state of Ohio.

*Id.* at 1015.

There can be no question that Governor Perry has "requisite community support" to be placed on the ballot in Virginia.  Adding Governor Perry (and the intervening plaintiffs) will not create a "laundry list" ballot.  Instead, it will give Virginia voters a meaningful choice and the right to participate in the most fundamental American constitutional process.

Thus, Plaintiff is likely to succeed on the merits because the Commonwealth cannot show that its misapplied petition gathering process is narrowly tailored to satisfy a compelling governmental interest.   The Court should, therefore, grant injunctive relief by mandating Governor Perry be added to the Republican primary ballot for the office of President of the United States.

Date:  January 6, 2012          Respectfully Submitted,


**THE HONORABLE RICK PERRY**


  /s/  Edward Everett Bagnell, Jr.                
Hugh M. Fain, III (VSB # 26494)
Email:  hfain@spottsfain.com
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email:  cmullins@spottsfain.com
Edward E. Bagnell, Jr. (VSB # 74647)
Email:  ebagnell@spottsfain.com
411 East Franklin Street, Suite 00
Richmond, VA  23219
Telephone:  (804) 697-2040
Facsimile:  (804) 697-2140

**BEIRNE, MAYNARD & PARSONS, L.L.P.**
Joseph M. Nixon (Admitted pro hac vice)
James E. ("Trey") Trainor, III (Admitted Pro hac vice)
Martin D. Beirne (Admitted pro hac vice)
1300 Post Oak Boulevard, Suite 2500
Houston, TX  77056
Telephone:  (713) 623-0887
Facsimile:  (713) 960-1527
jnixon@bmpllp.com
**ATTORNEYS FOR PLAINTIFF**
**THE HONORABLE RICK PERRY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 6, 2012, I will electronically file the foregoing document with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing (NEF) to all counsel of record:

E. Duncan Getchell, Jr.
Wesley G. Russell
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-2436
dgetchell@oag.state.va.us
wrussell@oag.state.va.us
*Counsel for Charles Judd, Kimberly Bowers*
*and Don Palmer, members of the Virginia*
*State Board of Elections, in their official*
*capacity*

Joseph N. Lief
Virginia International Raceway
1245 Pinetree Road
Alton, Virginia 24520
Telephone: (434) 822-7700
*Counsel for Charles Judd, Kimberly Bowers*
*and Don Palmer, members of the Virginia*
*State Board of Elections, in their official*
*capacity*

Lee Elton Goodman
LeClairRyan, A Professional Corporation
1701 Pennsylvania Ave NW
Suite 1045
Washington, DC 20006
lee.goodman@leclairryan.com
*Counsel for Pat Mullins,*
*in his official capacity as*
*Chairman of the Republican Party of Virginia.*

Charles M. Sims (VSB No. 35845)
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, Virginia 23219
Telephone: (804) 343-5091
Facsimile:  (804) 783-7655
Charles.sims@leclairryan.com
*Counsel for Patrick Mullins,*
*Chairman of the Republican Party of Virginia*

J. Christian Adams (VSB No. 42543)
Election Law Center, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Telephone: (703) 963-8611
Facsimile: (703) 740-1773
adams@electionlawcenter.com
*Counsel for Newt Gingrich, Jon Huntsman, Jr.*
*and Rick Santorum*

Stefan C. Passantino
J. Randolph Evans
Benjamin P. Keane
McKenna Long & Aldridge, LLP
1900 K St. NW
Washington, DC 20009
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
*Counsel for Newt Gingrich*

Craig Engle
Arnet Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
*Counsel for Jon Huntsman, Jr.*

Cleta Mitchell
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
*Counsel for Rick Santorum*

   /s/  Edward Everett Bagnell, Jr.
Edward Everett Bagnell, Jr. (VSB No. 74647)
Email:  ebagnell@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
P.O. Box 1555
Richmond, Virginia 23218-1555
Telephone: (804) 697-2000
Facsimile: (804) 697-2100
***Attorneys for The Honorable Rick Perry***