IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

**THE HONORABLE RICK PERRY,**

    Plaintiff,

**THE HONORABLE NEWT GINGRICH, THE
HONORABLE JON HUNTSMAN, JR., AND
THE HONORABLE RICK SANTORUM,**

    Intervenor-Plaintiffs,

v.                                                                                                             Civil No. 3:11-cv-856

**CHARLES JUDD, KIMBERLY BOWERS, and
DON PALMER, members of the Virginia State
Board of Elections, in their official capacities, and
PAT MULLINS, in his official capacity as
Chairman of the Republican Party of Virginia,**

    **Defendant**s.

_____/

**BRIEF OF INTERVENOR-PLAINTIFFS, THE HONORABLE NEWT GINGRICH, JON HUNTSMAN, JR., AND RICK SANTORUM**

NOW COME INTERVENOR-PLAINTIFFS, THE HONORABLE NEWT GINGRICH, JON HUNTSMAN, JR., AND RICK SANTORUM, who file this brief on the three issues requested by the Court.

**Introduction and Summary of the Argument**

The Commonwealth of Virginia, through the Virginia Board of Elections, and as applied by the Republican Party of Virginia,[1] has required a candidate of a political party to file with the State Board of Elections, 10,000 signatures of qualified voters in order to be on the Republican

---

[1] The Code of Virginia § 24.2-545 B states: "Any person seeking the nomination of the national political party for the office of President of the United States … *may* file with the State Board petitions signed by at least 10,000 qualified votes…" Oddly, it is not an actual requirement, though it is being applied as if it is mandatory.

primary ballot for the office of President of the United States.

The central questions to this case are: (1) whether the requirement that petition circulators be Virginia residents who are eligible to vote is a narrowly tailored restriction on the First and Fourteenth Amendments designed to serve a compelling state issue; (2) whether this action by Plaintiff is timely; and (3) what is the remedy.

The Court need only consider the constitutional issues in the first question if it deems the statutory language of VA Code Ann. § 24.2-545 B mandates the filing of petitions. Use of the word "may", however, clearly states the legislature's intent to make optional or permissive the filing of petitions when seeking a ballot position for the office of President of the United States. VA Code Ann. § 24.2-544 B. *See Zinone v. Lee's Crossing Homeowner's Assn*., 282 VA 30, 714 S.E.2d 922, 925 (VA Sup. Ct. 2011).

In a case decided by the Virginia Supreme Court only four months ago, the Court interpreted legislative intent regarding use of the words "shall" and "may" in statutory language. *Zinone*, supra. It reasoned:

> "We look to the plain meaning of the statutory language, and presume that the legislature chose, with care, the words it used when it enacted the relevant statute." *Addison,* 281 VA at 208, 704 S.E.2d at 404 (citations and internal quotation marks omitted). Moreover, when the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional. *Zinone*, supra., at 925 (citations omitted).

Since the clear language of VA Code Ann. § 24.2-545 B is permissive as to filing any petitions, the Defendants have misapplied the statute and wrongfully denied Intervening Plaintiffs positions on the ballot for office of President of the United States in the Republican Primary.[2] The Court needs to consider the constitutional issues regarding restrictions on ballot

---

[2] The court may reach its decision on this basis alone and issue its mandate remedying this misapplication as to all

circulators only if any petition requirement exists in Virginia law regarding the office of President of the United States. If ballot circulation restrictions are applicable in this case, those restrictions directly limit First Amendment rights of free speech and freedom of association. *Buckley v. ACLF*, 535 U.S. 182, 186; *Meyer v. Grant*, 486 U.S. 414 (1988).

When a state regulation severely restricts First Amendment rights, the burden is *on the government* to prove that the restriction is narrowly tailored to serve a compelling government interest. *Citizens United v. FEC,* 130 S. Ct. 876, 898 (2010); *see also Meyer,* 486 T.J.S. at 428 (law at issue "imposed a burden on political expression that *the State . . . failed* to justify"); *ACLF,* 525 U.S. at 195 (same) *(quoting Meyer).* The burden is on the government even at the preliminary injunction stage because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429 (2006) (observing that in *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004), the Court appropriately granted a preliminary injunction "where *the Government* had failed to show a likelihood of success under the compelling interest test" (emphasis added)).

To satisfy its burden, a state must provide more than speculative, categorical answers. *See Gonzales,* 546 U.S. at 430-31 (strict scrutiny is not satisfied by a "categorical approach," but rather, requires a case-by-case determination of the question). In other words, the government "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994) (citation and internal quotation marks omitted); *see also Meyer, 486* U.S. at 426 (refusing to accept state's bald argument that paid circulators might be more tempted to

---

plaintiffs who asked to be put on the ballot. The Court need not rule further on the questions relating to the process and numerocity of the petitions.

3

cheat than volunteer circulators where the state offered "[n]o evidence . . . to support that speculation").

Virginia cannot meet its burden regarding the petition requirements placed upon a candidate to be on a political party's primary ballot for the office of President of the United States. The statute is facially defective in that five of the seven nationally recognized candidates for office were excluded from the ballot.[3] *See Lubin v. Parrish*, 415 U.S. 709, 715 (1974) (state has legitimate interest in preventing laundry list ballots; but process which limits ballot access to legitimate candidates gives rise to constitutional questions.)

Virginia's requirement that petition circulators be eligible to vote in Virginia is an unwarranted restriction on the number of political message carriers.[4] There is no legitimate state interest served by this restriction on First Amendment rights.

Intervening Plaintiffs timely sought injunctive relief at the time actual injury occurred. To have brought this suit before they were declined a position on the ballot would have only presented the court with a hypothetical issue and subjected the claim to a ripeness defense. *Texas v. U.S.*, 523 U.S. 296 (1998).

When a civil rights violation has occurred, as in this case, the court should fashion a remedy placing the plaintiffs in the position as if the violation had not occurred. Accordingly, the only appropriate remedy is for this Court to issue an order mandating the Defendants place Intervening Plaintiffs on the Republican primary ballot for the office of President of the United States. *See McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (requiring a candidate be placed

---

[3] Congresswoman Michele Bachmann has now suspended her candidacy.

[4] Even Intervening Plaintiff Huntsman himself is prohibited from circulating petitions. If each of the 50 states, the District of Columbia, Puerto Rico, and other U.S. territories which participate in the primary process had Virginia's identical requirements, it would be unrealistic for even one national candidate to be on all the ballots in every jurisdiction.

4

on the ballot).

## Argument

I. **Virginia's residency/eligibility requirement for petition circulators is a burden on political expression Virginia cannot justify.**

States have advanced three primary interests in support of state-residency requirements for petition circulators. First, states have suggested that the residency requirements serve the state's police interest by ensuring that petition circulators will be amenable to the state's subpoena power. Second, states have suggested that the circulator-residency requirements serve the state's interest in protecting the integrity of the electoral process. Finally, states have affirmed that they have an interest in ensuring that only district voters be allowed to influence district politics. Whether or not these interests are compelling, the Commonwealth cannot show that its residency requirement is narrowly tailored to any of them. Therefore, Intervening Plaintiffs have likely success on the merits.

    A. **The state-residency requirement is not narrowly tailored to the Commonwealth's interest in ensuring that petition circulators are subject to the Commonwealth's subpoena power.**

In defense of state-residency requirements, states have suggested that such a requirement is necessary to ensure that petition circulators are amenable to the state's subpoena power. *See e.g., ACLF,* 525 U.S. at 196. Because the state-residency requirement is not narrowly tailored to serve this interest, it is unnecessary to decide whether this interest is compelling, a point which is itself debatable. *Compare Yes on Term Limits, Inc.,* 550 F.3d at 1030 n.3 ("far from clear" that the ability to question circulators "significantly *aids"* in protecting the integrity of the electoral process), *with Initiative & Referendum Inst.,* 241 F.3d at 617 (state-residency requirement compelling).

There are at least two reasons why the statute here is not narrowly tailored to the

Commonwealth's subpoena power interest. First, the statute is not narrowly tailored in that the Commonwealth's subpoena power extends beyond its borders, provided that the subpoena is related to activities that occurred within its borders. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 882 (3d Cir. 1997). A law authorizing the issuance of a subpoena over anyone that circulated a petition is a far more direct method of serving the state's interest and excludes few, if any, from the class of potential petition circulators.

Second, the statute is not narrowly tailored because the Commonwealth could advance its interest more narrowly by requiring circulators to agree to answer a subpoena as a condition of petition circulation. The requirement could appear along with the witness affidavit on the petition form itself, and the Commonwealth could impose criminal penalties for failure to appear. Courts have consistently noted that imposing such a condition on petition circulators is one way for states to address their subpoena-power interest in a narrowly tailored fashion. *See, e.g., Yes on Term Limits,* 550 F.3d at 1030 (state could provide criminal penalties for circulators who failed to answer consented-to subpoena); *Brewer,* 531 F.3d at 1037 ("[C]ourts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement"); *Chandler,* 292 F.3d at 1242-44 (city-residency requirement was "substantially broader than necessary" in part because city could require circulators to agree to submit to jurisdiction as a prerequisite to circulating petitions); *Krislov,* 226 F.3d at 866 n.7 (invalidating residency requirement and suggesting agreement to submit to jurisdiction as permissible restriction to address state's interest in preventing fraud).

To the extent the state-residency requirement merely facilitates the prosecution of lawbreaking circulators by furnishing the Commonwealth with the circulator's whereabouts, it is not narrowly tailored to serve that purpose either. The Commonwealth already requires each

6

petition circulator to provide, under penalty of perjury, her name and address.[5] This disclosure is sufficient to serve the Commonwealth's policing interest, for if and when the Commonwealth discovers fraudulent activity by a circulator, the circulator's notarized submission – available to law enforcement officers – gives it ample information to locate the offending circulator, and to investigate and prosecute any violations.[6]

The state-residency requirement is, therefore, not narrowly tailored to achieve any state interest in policing lawbreaking circulators.

### B. The state-residency requirement is not narrowly tailored to serve the Commonwealth's interest in protecting the integrity of the electoral process.

States have also asserted that circulator-residency requirements are necessary to protect the integrity of the electoral process. *See, e.g., Krislov,* 226 F.3d at 865. Specifically, states have argued that residency requirements increase the probability that only valid signatures will be collected. Like the state's policing interest, however, it makes no difference whether the integrity-of-the-process interest is classified as compelling, because the state-residency requirement is not narrowly tailored to serve the interest.

As a threshold matter, it is not entirely clear *how* the state-residency requirement ensures that only valid signatures are collected. *See, e.g., Lerman,* 232 F.3d at 150 (government "failed to suggest *any* meaningful relationship" between the residency requirement and government's interest in "protecting the integrity of the signature collection process"). Virginia already addresses, by other means, its interest in ensuring that only valid signatures are counted. For

---

[5] The petition form itself indicates that the penalty for "falsely signing this affidavit" is a maximum fine of $2,500, imprisonment up to ten years, or both. *See also* Va. Code Ann. § 24.21016 ("Any willfully false material statement or entry made by any person in any statement, form, or report required by this title shall constitute the crime of election fraud and be punishable as a Class 5 felony.").

[6] Indeed, the Commonwealth recently prosecuted two petition circulators for voter fraud and false statement on the form, both felonies. *See* http://voices.washingtonpost.com/crime-scene/arlington/two-indicted-on-voter-fraud-in.html.

7

instance, all circulators are required to sign an affidavit on the petition form itself stating that they personally witnessed each signature on the petition. Falsely signing the affidavit subjects the circulator to potential criminal penalties, including up to ten years imprisonment. Va. Code Ann. § 24.2-1016. Unlike these legitimate provisions, however, the state-residency requirement simply does not advance the Commonwealth's interest in ensuring that only valid signatures are counted. *See Meyer, 486 U .S.* at 426-27 (noting that "[o]ther provisions" of Colorado law expressly addressed the potential danger that circulators "might be tempted to pad their petitions with false signatures").

Another justification that states have advanced is that residency restrictions protect the electoral process by increasing the likelihood that circulators have "some familiarity with persons who sign petitions." *See, e.g., Lerman, 232* F.3d at 150 (internal quotation marks omitted). This asserted justification is a direct, unwarranted limitation on free speech and freedom of association in that it seeks to limit political discussions to those individuals known by the circulator. Again, given the size of the Commonwealth, requiring petition circulators to be residents of the state does not necessarily serve this interest. In short, there is no apparent basis for concluding that resident-circulators are any more (or less) trustworthy, honest, or forthright than their neighbors in other states. *Cf. Meyer,* 486 U.S. at 426 ("[W]e are not prepared to assume that a professional circulator … is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.").

Therefore, the state-residency requirement is not narrowly tailored to serve the Commonwealth's interest in protecting the integrity of its electoral process. *Buckley v. ACLF*, 525 U.S. 182 (1999). *See Krislov v. Rendour*, 226 F.3d 851 (7th Cir. 2000); *Lerman v. Board of*

*Elections*, 232 F.3d 135 (2d Cir. 2000); *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002), as well as to recall petitions, *Bogaert v. Land*, 572 F. Supp. 2d 883 (W.D. Mich.), appeal dismissed, 543 F.3d 862 (6th Cir. 2008).

### C. The state-residency requirement cannot be supported by an interest in allowing only state voters to influence state politics.

States have also argued that residency restrictions are a necessary means to advance their interest in ensuring that only state voters be allowed to influence state politics. *See, e.g., Krislov,* 226 F.3d at 865. This argument conflates a state's legitimate interest in ensuring that state residents alone be permitted to *select and elect* their representatives, with the wholly illegitimate interest of *banning non-resident political speech.* Because Virginia's state-residency requirement advances only the latter, illegitimate interest, it cannot survive strict scrutiny.[7]

Only those signatures on the petition form are counted, and only residents are permitted to sign the petition form (non-resident signatures are not counted). So there is no apparent reason why the circulator must also be a state resident, *unless* the real interest advanced by the law is to "help … prevent non-residents from influencing politics within the [state]." *See Lerman,* 232 F.3d at 152. Such an interest, the Second Circuit observed, "does not appear to be legitimate at all." *Id.; see also Krislov,* 226 F.3d at 866 ("question[ing the] legitimacy" of a state's interest in "preventing citizens of other States from having any influence" on its elections). The Second Circuit explained: "A desire to fence out non-residents' political speech

---

[7] To the extent the Commonwealth contends that it has an interest in ensuring that only state residents be permitted to *select and elect* their representatives, Intervening Plaintiffs agree. *See Supreme Court of N.H. v. Piper,* 470 U.S. 274, 282 n.13 (1985) ("A State may restrict to its residents, for example, both the right to vote, and the right to hold state elective office." (citation omitted)); *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68-69 (1978) ("[A] government unit may legitimately restrict the right to participate in its political processes to those who reside in its borders."). But that valid interest is fully protected by several other provisions of Virginia law. Specifically, Virginia prohibits non-state residents from signing petitions, voting in primary elections, and voting in the general election[7]. Va. Code Ann. §§ 24.2-506 (only qualified voters may sign candidate petitions); 24.2-101 (qualified voter must be a resident of the Commonwealth and of the precinct in which he offers to vote); 24.2-400 (a qualified voter who is registered to vote is "entitled to vote in the precinct where he resides"); 24.2-530 (who may vote in primary).

– and to prevent both residents and non-residents from associating for political purposes across district boundaries – simply cannot be reconciled with the First Amendment's purpose of ensuring 'the widest possible dissemination of information from diverse and antagonistic sources.' *Lerman,* 232 F.3d at 152 *(quoting Krislov,* 226 F.3d at 866); *Warren v. Fairfax County,* 196 F.3d 186,189-90 (4th Cir. 1999) (invalidating law that prohibited non-residents from using a public forum to "engage in First Amendment activity").[8]

## II. Intervening Plaintiffs were diligent in seeking redress and, therefore, their claims are not barred by laches.

In asserting the equitable defense of the doctrine of laches, Defendants must demonstrate they were prejudiced by Intervening Plaintiffs unreasonable delay in pursuing their rights or claims. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). In this pre-election suit, Intervening Plaintiffs diligently pursued their efforts to comply with Virginia's unconstitutional election laws. Speaker Gingrich, Governor Huntsman, and Senator Santorum suffered injuries-in-fact when they were denied positions on the Republican primary ballot on December 22, 2011 and December 23, 2011, respectively. Just four (4) days following those determinations, on December 27, 2011, Plaintiff Rick Perry filed suit against Defendants seeking declaratory and injunctive relief. Intervening Plaintiffs filed a prompt motion for intervention in Governor Perry's suit on Wednesday, January 4, 2012, just eight (8) days after the initial claims against Defendants were raised. This Court promptly granted that motion and Intervening Plaintiffs

---

[8] If, indeed, preventing non-state residents from having any influence on state politics were recognized as a legitimate (or rather, compelling) state interest, the Commonwealth could do much more than require circulators to be state residents. *See Yes on Term Limits,* 550 F.3d at 1029 n.2 (rejecting state's purported interest in "restricting the process of self-government to members of its own community" and adding that to accept such an interest would have "far-reaching consequences" (internal quotation marks omitted)). Under the same premise, Virginia could prevent all non-resident citizens from campaigning on behalf of any candidate for office. Or, it could ban radio and television ads that promote the election or defeat of candidates, if such ads were funded or created by non-residents. *See id.* (surmising that if the court were to accept such an interest, the state could also, by logical extension, validly prohibit non-residents from "driving voters to the polls"). These are clearly illegitimate restrictions on free speech and demonstrate the absurdity of precluding non-resident political speech.

subsequently filed a complaint against Defendants the same day, less than two weeks after they were initially informed that they did not meet the petition requirements to be on the ballot.[9]

The failure of Intervening Plaintiffs or Governor Perry to have made the same claim before the date on which signature petitions were due does not give rise to the defense of laches. Laches simply does not apply as a defense before a claim is ripe. *Public Citizen v. Miller*, 813 F. Supp. 821 (N.D. __ 1993, aff'd 992 F.2d 1548 (11th Cir. 1993) (per curium). Accordingly, Plaintiff and Intervening Plaintiffs did not have ripe claims until and unless they were denied ballot access and suffered actual harms. *See Texas v. U.S.*, 523 U.S. 296 (1998) (citing *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-581 (1985) ("a claim is not ripe if it rests upon '"contingent future events that may not occur…"'").

Intervening Plaintiffs' requested relief does not prejudice Defendants. Instead, the denial of the relief requested by Intervening Plaintiffs will prejudice and abridge the constitutional rights of Speaker Gingrich, Governor Huntsman, Senator Santorum, and Virginia voters. Such violations of Intervening Plaintiffs' and the Virginia voters' constitutional rights should not go unremedied. *See McCarthy v. Briscoe*, 429 U.S. 1317, 1322 (U.S. 1976) (ordering a candidate's name to be placed on the ballot as the remedy after the candidate's constitutional rights were violated).

"Laches imposes on [Defendant] the ultimate burden of proving "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). "Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be

---

[9] Those days included Christmas Eve, Christmas Day and the generally recognized national holiday of December 26th in which the federal courthouse was closed and on which an original complaint could not have been filed.

no bar to relief." *Gardner v. Panama R. Co.*, 342 U.S. 29, 31 (1951).

### A. Intervening Plaintiffs were diligent.

"The first element of laches—lack of diligence—exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *White*, 909 F.2d at 102 (quoting *National Wildlife Federation*, 835 F.2d at 318; citing *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966); *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 (5th Cir. 1985)). The uncontroverted evidence in this case establishes Intervening Plaintiffs attempted to comply with Virginia's unconstitutional voting laws and did not sit on their rights after it became clear they would not be placed on the ballot.

After receiving notice that their names would not be placed on the ballot, Intervening Plaintiffs joined in Plaintiff Perry's suit, filed less than a week after the denial of access by Defendants. Accordingly, Intervening Plaintiffs cannot be charged with a lack of diligence in enforcing their rights. *See Smith v. Bd. Of Election Comm'rs for the City of Chicago*, 587 F. Supp. 1136, 1142 (N.D. Ill. 1984) (holding three candidates could not be charged with a lack of diligence prior to submitting their signatures because they may well have expected to be able to comply with the applicable statute). *See also McCarthy v. Brisco*, supra at 1322 (overruling finding of laches defense).[10]

### B. Defendants are not prejudiced.

"The second element—prejudice to the defendant—is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused

---

[10] In *McCarthy*, the state argued that it was too late to add the candidate's name to the statewide ballot and the District Court and Court of Appeals denied relief on the basis of laches, 418 F. Supp. 816 at 818 and 539 F.2d 1353. However, Mr. Justice Powell, as Circuit Judge for injunctive relief wrote for the Supreme Court: "This Court will normally accept findings of a district court affirmed by a court of appeals, on factual consideration such as those underlying a determination of laches. But acceptance of findings of fact does not, in this case, require acceptance of the conclusion that violation of the applicants' constitutional rights must go unremedied." *Id* at 1322. The Supreme Court then ordered the candidate's name be added to the ballot. *Id* at 1323.

12

by detrimental reliance on the plaintiff's conduct." *White*, 909 F.2d at 102 (*Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982). In this case, the only prejudice Defendants might suffer is their inability to enforce Virginia's unconstitutional election laws. Defendants have taken no affirmative action to which they can allege to have been prejudiced.

Further, the ballots for the election have not been printed, and are not due under current Virginia law to be mailed until January 21, 2012—45 days prior to the election. *See* VA. CODE ANN. § 24.2-612. If Defendants proceed to print ballots without Intervening Plaintiffs' names before this Court makes its ruling, any prejudice and damage caused by having to reprint the ballots after this Court makes a ruling will be of Defendants' own making.

Intervening Plaintiffs have been diligent in seeking redress for the violations of their constitutional rights by joining in Plaintiff Perry's suit just days after failing to secure the unconstitutionally high number of signatures required to be placed on Virginia's ballot. Furthermore, Defendants cannot demonstrate any prejudice from the timing of Intervening Plaintiffs' or Governor Perry's suit. Equity clearly favors Intervening Plaintiffs and Governor Perry, and Defendants' defense of laches should be denied. *McCarthy*, supra at 1322-23.

**III.    The remedy the Court should mandate is to place Intervening Plaintiffs on the Republican primary ballot for the office of President of the United States.**

The only remedy available to this Court is to place the Plaintiff's name on the ballot. In the analogous case of Libertarian Party of Ohio v. Brunner, 567 F. Supp. 2d 1006, 1015 (S.D. Ohio 2008) the district court wrote:

> To remedy the unconstitutional ballot access procedures in Michigan, the Court of Appeals affirmed the district court's order placing Plaintiff Goldman-Frankie's name on the ballot. As instructed by the Supreme Court in *McCarthy v. Briscoe*, 429 U.S. 1317, 1323, 97 S.Ct. 10, 50 L.Ed.2d 49 (U.S. 1976), "[i]n determining whether to order a candidate's name added to the ballot as a remedy for a State's denial of access, a court should be sensitive to the State's legitimate interest in

preventing 'laundry list' ballots that 'discourage voter participation and confuse and frustrate those who do participate.'" *Quoting Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct 1315, 39 L.Ed.2d 702 (1974). But where a state has unconstitutionally prevented a party or a candidate from accessing the ballot, "a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support." *See McCarthy v. Briscoe*, 429 U.S. at 1323, 97 S.Ct. 10.

The Constitution gives the Ohio legislature significant discretion to establish election procedures. After the state statute was held to fall outside "the boundaries established by the Constitution," the legislature failed to act. *Blackwell*, 462 F.3d at 595. The Court will not prescribe Constitutional election procedures for the state, but in the absence of constitutional, ballot access standards, when the "available evidence" establishes that the party has "the requisite community support," this Court is required to order that the candidates be placed on the ballot. *McCarthy*, 429 U.S. at 1323, 97 S.Ct. 10. As set out above, the Court finds that the Libertarian Party has the requisite community support to be placed on the ballot in the state of Ohio. *Id* at 1015.

There can be no question that Intervening Plaintiffs have "requisite community support" to be placed on the ballot in Virginia. Adding Intervening Plaintiffs (and Governor Perry) will not create a "laundry list" ballot. Instead, it will give Virginia voters a meaningful choice and the right to participate in the most fundamental of American constitutional processes.

Thus, Intervening Plaintiffs are likely to succeed on the merits because the Commonwealth cannot show that its misapplied petition gathering process is narrowly tailored to satisfy a compelling governmental interest. The Court should, therefore, grant injunctive relief by mandating that Intervening Plaintiffs be added to the Republican primary ballot for the office of President of the United States.

                                                 Respectfully Submitted,

                                                 **The Honorable Newt Gingrich**
                                                 **The Honorable Jon Huntsman, Jr.**
                                                 **The Honorable Rick Santorum**

    _____/S/_____
J. Christian Adams
Election Law Center, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel: 703-963-8611
Fax: 703-740-1773
adams@electionlawcenter.com
Virginia Bar #42543


Stefan C. Passantino
J. Randolph Evans
Benjamin P. Keane
McKenna Long & Aldridge, LLP
1900 K St. NW
Washington, DC 20009
Tel: 202-496-7500
Fax: 202-496-7756

ATTORNEYS FOR INTERVENOR-
PLAINTIFF NEWT GINGRICH
*Pro Hac Vice applications pending*

Craig Engle
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Tel: 202-857-6000
Fax: 202-857-6395

ATTORNEY FOR INTERVENOR-
PLAINTIFF JON HUNTSMAN, JR.
*Pro Hac Vice application pending*


Cleta Mitchell
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007-5109
Tel: 202-672-5300
Fax: 202-672-5399

ATTORNEY FOR INTERVENOR-
PLAINTIFF RICK SANTORUM
*Pro Hac Vice application pending*