IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| THE HONORABLE RICK PERRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | Civil Action No. 3:11-CV-856 |
| THE HONORABLE NEWT GINGRICH, ) | |
| THE HONORABLE JON HUNTSMAN, JR., ) | |
| and THE HONORABLE RICK ) | |
| SANTORUM, ) | |
| ) | |
| Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| CHARLES JUDD, Member of the Virginia ) | |
| State Board of Elections, in his official ) | |
| capacity, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INC., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The First Amendment places a premium on political speech, especially speech about elections for public office. By imposing a state residency requirement on those who help solicit the 10,000 signatures necessary for a presidential candidate to appear on the ballot, Virginia reduces the quantity of such speech available in Virginia, and directly infringes on the First Amendment rights of candidates, voters, petition circulators, and political parties. Because Virginia cannot show that the residency requirement is narrowly tailored to serve a compelling state interest, *amicus* respectfully urges the Court to grant the plaintiffs' motion for preliminary injunction.

**INTEREST OF *AMICUS CURIAE***

The American Civil Liberties Union of Virginia (ACLU of Virginia) is an affiliate of the American Civil Liberties Union, the nation's oldest organization dedicated to protecting civil liberties. The ACLU of Virginia appears frequently in state and federal courts in Virginia, both as *amicus* and as direct counsel, in cases affecting the civil and constitutional rights of Virginia residents. Among the ACLU of Virginia's top priorities are the right to vote and the right to free speech, both of which are implicated by this case.

**ARGUMENT**

In evaluating ballot access cases, courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 192 (1999). The Supreme Court has twice considered statutes that restrict who may circulate petitions in support of a ballot measure, and has twice invalidated the restrictions. In *Meyer v. Grant*, 486 U.S. 414 (1988), the Court struck down Colorado's prohibition on paid petition circulators. Holding that the restriction was "a limitation on political expression subject to exacting scrutiny," 486 U.S. at 420, the Court found that the state had failed to justify the burden on advocates' free speech rights. In *Buckley*, the Court invalidated a requirement that petition circulators be registered voters of the state, holding that the "requirement cuts down the number of message carriers in the ballot-access arena without impelling cause." 525 U.S. at 197.

Although *Buckley* expressly reserved the question of whether residency requirements like the one at issue here would be unconstitutional, 525 U.S. at 197, nearly every court to consider the matter has relied on *Buckley* and *Meyer* to hold such requirements unconstitutional, in the context of both ballot initiatives and candidate ballot access. *See Citizens in Charge v. Gale*, ---

F.Supp.2d ---, 2011 WL 3841594 (D. Neb. Aug. 30, 2011) (invalidating residency requirement for circulators of petition for ballot initiative); *Yes on Term Limits v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (same); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236 (same); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (invalidating state residency requirement for circulators of petition for presidential candidate ballot access); *Nader v. Brewer,* 531 F.3d 1028 (9th Cir. 2008) (same); *Daien v. Ysursa*, 711 F.Supp.2d 1215 (D. Idaho 2010) (same); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) (invalidating district residency requirement for circulators of petition for state legislator candidate ballot access); *Lerman v. Board of Elections*, 232 F.3d 135 (2nd Cir. 2000) (invalidating district residency requirement for circulators of petition for city council candidate ballot access). *See also, Lux v. Judd,* 651 F.3d 396 (4th Cir. 2011) (reversing dismissal of challenge to district residency requirement for circulators of petition for congressional candidate ballot access). *But see Initiative and Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (upholding state residency requirement for circulators of ballot initiative petitions).

Seeking to limit the devastating weight of the case law, the state defendants have claimed that those cases addressing ballot initiative petitions, rather than candidate petitions, are not relevant. (Defs' Mem. at 12.) But they do not explain why residency requirements for candidate ballot access should be entitled to any less constitutional scrutiny than the same requirements for statewide ballot initiatives, and courts have rejected such a distinction. *See Nader v. Blackwell*, 545 F.3d at 475 ("[C]ommon sense suggests that, in the course of convincing voters to sign their petitions, candidate-petition circulators engage in at least as much 'interactive political speech' – if not more such speech – than initiative petition circulators."); *Krislov*, 226 F.3d at 861-62 ("the ballot initiative proponent will generally seek support for the one narrow issue presented in the

initiative, while the typical candidate embodies a broad range of political opinions, and thus those who solicit signatures on their behalf must speak to a broader range of political topics," so a restriction on candidate petition circulators "has the potential to squelch a greater quantity and broader range of political speech than laws which only restrict initiative proponents."); *Lerman*, 232 F.3d at 148 ("There is no basis to conclude that petition circulation on behalf of a candidate involves any less interactive political speech than petition circulation on behalf of a proposed ballot initiative – the nature of the regulated activity is identical in each instance.")  Nor have the defendants stated any reason for treating this case differently from the cases involving district residency requirements, as opposed to statewide residency requirements.  As will be seen below, the arguments put forth in those cases apply equally to this one.

As in the cases cited above, the residency requirement here imposes a serious burden on political discourse, and must therefore be reviewed under a strict scrutiny standard.  As in those cases, the state has failed to show that the residency requirement is narrowly tailored to serve a compelling governmental interest.

I.  VIRGINIA'S RESIDENCY REQUIREMENT FOR PETITION CIRCULATORS SEVERELY BURDENS THE FIRST AMENDMENT RIGHTS OF CANDIDATES, PETITION CIRCULATORS, POLITICAL PARTIES, AND VOTERS.

In evaluating the constitutionality of an election law, "the rigorousness of [the court's] inquiry . . . depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  When constitutional rights "are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks and citation omitted).  "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the

State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks and citation omitted).

Here, the provision at issue undoubtedly places serious burdens on the First Amendment rights of the plaintiff and intervenor presidential candidates. But they are far from the only people affected. The residency restriction also burdens the free speech rights of nearly everyone who participates, or wishes to participate, in the Republican Party nominating process, including would-be petition circulators, voters, and the Republican Party itself. The severity of these burdens requires the Court to evaluate the regulation using strict scrutiny.

### *Candidates*

In *Meyer*, the Court explained that the circulation of an initiative petition involves "the liberty to discuss publicly and truthfully all matters of public concern" at the core of the First Amendment. 486 U.S. at 414 (citation omitted). Such discussion is inherent in the petition process:

> Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it.

486 U.S. at 421. Similarly, circulating a petition to put a candidate on the ballot requires circulators to explain and answer questions about a candidate's positions, and to persuade signatories that the candidate's ideas are serious enough to warrant his or her appearance on the state ballot.

For candidates, therefore, the petition process is a vital means for conveying their message to voters. When the state regulations reduce the number of eligible circulators, it undermines candidate speech in two ways:

> First, it limits the number of voices who will convey [the candidate's] message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that [the candidate] will garner the number of signatures necessary to place the matter on the ballot, thus limiting [his or her] ability to make the [candidacy] the focus of statewide discussion.

*Id.* at 422-23. While there are other means for candidates to spread their message, "[t]he First Amendment protects [candidates'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424.

Additionally, the restriction "burdens [candidates'] right to associate with a class of circulators." *Krislov*, 226 F.3d at 860:

> Although the [Virginia] provision does not go so far as to specifically prohibit candidates from associating with individuals who are not residents of [Virginia] . . ., it still substantially burdens this right of association by preventing the candidates from using signatures gathered by these circulators . . . . By doing so, the law inhibits the expressive utility of associating with these individuals because these potential circulators cannot invite voters to sign the candidates' petitions . . . .

*Id.* at 861.

As in *Meyer* and *Buckley*, the Virginia residency requirement "drastically reduces the number of persons, both volunteer and paid, available to circulate petitions," *Buckley*, 525 at 193, severely burdening this important means of communication for candidates.

### *Petition Circulators*

Because those circulating the petitions are the ones most directly engaging in the effort to persuade voters of the value of a particular candidate, it follows that the residency requirement also gravely diminishes the free speech rights of out-of-state residents who wish to circulate petitions in Virginia.

The residency restriction affects the free speech rights of out-of-state circulators in a number of ways. First, it deprives them of the opportunity to persuade voters in Virginia of the viability of their candidate. Although the restriction "does not specifically preclude these

6

circulators from speaking for the candidates . . . .[,] by making an invitation to sign the petition a thoroughly futile act, it does prevent some highly valuable speech from having any real effect. Robbed of the incentive of possibly obtaining a valid signature, candidates will be unlikely to utilize non-registered, non-resident circulators to convey their political message to the public." *Krislov*, 226 F.3d at 861 n.5.

Second, the residency requirement "limit[s] the nature of the support [a circulator] can offer" to his or her candidate of choice, because it "completely precludes [a circulator] from participating in the single most critical part of . . . a candidacy . . . that of obtaining sufficient nominating signatures to appear on the [state] ballot." *Daien*, 711 F.Supp.2d at 1224. Third, an out-of-state circulator "has an interest in who qualifies for President in every state," and the candidate he supports is "burdened in [his or her] attempt to gain ballot access in [Virginia] because they are not permitted to enlist the assistance of non-[Virginia] residents to circulate petitions." *Id.*

Finally, just as the residency requirement burdens a candidate's right to expressive association with potential out-of-state circulators, it burdens the circulators' right to associate with a candidate and with the voters of Virginia. *See Lerman*, 232 F.3d at 143 (noting circulator's "rights to engage in interactive political speech and expressive political association across electoral district boundaries.")

### *Voters*

Not only are those disseminating information – the candidates and the circulators – burdened by Virginia's regulation, those who would receive the information – voters – are burdened as well. "[T]he Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557 (1969). "This right is an inherent corollary of the rights of free

7

speech and press that are explicitly guaranteed by the Constitution." *Bd. of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). By reducing the number of available petition circulators, the residency restriction "restricts the speech available to [Virginians], who benefit from the free exchange of ideas and political dialogue that comes from petition circulation." *Daien*, 711 F.Supp.2d at 1231. *See also Krislov*, 226 F.3d at 859 n.3 ("Of course, the restriction also affects the rights of . . . those who might hear their message.")

In addition to depriving Virginia residents of speech by out-of-state petition circulators, the residency restriction burdens voters' First Amendment rights by limiting their choices on the primary ballot. Virginia does not allow write-in votes in primary elections, Va. Code § 24.2-529, so voters are precluded from voting for those candidates who are barred from the ballot because they were not able to gather enough signatures. "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Illinois State Board of Elections*, 440 U.S. at 184. This is especially consequential in an election, such as this one, in which a large number of candidates are vying for the nomination. Because they do not have the options available to voters in other states, Virginia's Republican voters have less of a say in who will be the party's nominee.

*Political Parties*

"Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). Thus, "the right of individuals to associate for the advancement of political beliefs" is "fundamental." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184

(1979) (internal quotation marks and citation omitted). Moreover, the choice of a party nominee is a key element of a party's right to political association:

> [The nomination] process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views.

*Jones*, 530 U.S. at 575. Thus, the Supreme Court has recognized "the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." *Id.* at 575 (internal quotation marks and citation omitted). Just as the residency requirement burdens voters' First Amendment right to cast an effective vote by limiting the choice of candidates, it burdens political parties by limiting their choice of standard bearers.

II. VIRGINIA'S RESIDENCY REQUIREMENT IS NOT NARROWLY TAILORED TO SERVE A COMPELLING GOVERNMENT INTEREST.

Because the residency restriction imposes a severe burden on First Amendment rights, the Court must determine if it is narrowly tailored to serve a compelling government interest. *Burdick*, 504 U.S. at 434. Defendants fail even to articulate a compelling interest; instead, they refer vaguely to dicta in *Buckley* suggesting that a residency requirement *might* "be upheld as a needful integrity policing measure." Defs' Mem. at 10; *Buckley*, 525 U.S. at 197 (reserving the question of whether a residency requirement would be constitutional). And lower courts have almost unanimously rejected the proposition that a residency requirement is narrowly tailored to serve the state's interest in protecting the integrity of elections.

First, there is no reason to believe that allowing non-resident circulators increases the number of fraudulent or invalid signatures. *See Nader v. Brewer*, 531 F.3d at 1037 ("the state [did not] ever contend that its history of fraud was related to non-resident circulators, a history

that might justify regulating non-residents differently from residents."); *Yes on Term Limits*, 550 F.3d at 1029 (evidence "does not support the inference that, *as a class*, non-resident circulators are more likely to engage in fraud than resident circulators.") (emphasis in original); *Krislov*, 226 F.3d at 865 ("a resident would likely be at the same risk of obtaining an invalid signature . . . as would a non-resident."); *Daien*, 711 F.Supp. 2d at 1235 ("there is no evidence in the record nor is there any common sense argument that Idaho residents are less likely to commit voter fraud than out-of-state residents.")

Some states have argued that residency requirements protect their ability to subpoena petition circulators in order to question them about the legitimacy of signatures. Courts have held that residency requirements are not narrowly tailored to that interest, because it can be served just as well by requiring circulators to consent to the state's jurisdiction. *See Citizens in Charge*, 2011 WL 3841594 at *9; *Nader v. Brewer*, 531 F.3d at 1037 ("Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result."); *Yes on Term Limits*, 550 F.3d at 1030 ("Oklahoma could require that in order to circulate petitions, non-residents enter into agreements *with the state* . . . wherein the circulators provide their relevant contact information and agree to return in the event of a protest. In addition, Oklahoma could provide criminal penalties for circulators who fail to return when a protest occurs.") (emphasis in original) (citation omitted); *Chandler*, 292 F.3d at 1244 (The city "could require . . . the prospective circulator [to] agree to submit to the jurisdiction of the [city court] for the purpose of subpoena enforcement."); *Daien*, 711 F.Supp.2d at 1234 ("There is an alternative and less

restrictive means of achieving these ends, by which the legislature could require petition circulators to subject themselves to the subpoena power of Idaho courts.").

The state asserts in a conclusory fashion that "direct subpoena authority is more effective than an undertaking to be subject to out-of-state jurisdiction." (Defs' Mem. at 14.) But "[t]he burden is on the Government to *prove* that the proposed alternatives will not be as effective as the challenged statute." *Yes on Term Limits*, 550 F.3d at 1030 (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (emphasis added)). The state has not done so here. *See Nader v. Brewer*, 531 F.3d at 1037 (noting that the state did not provide any evidence for its contention that "a 'consent to jurisdiction' system would be unworkable.") Indeed, the consent-to-jurisdiction option arguably *better* serves the state's objective than a residency requirement, because the latter does not account for the possibility that *resident* circulators could leave the state and avoid the state's subpoena power. *Chandler*, 292 F.3d at 1244.[1]

Although the state does not appear to assert any other interests to support the residency requirement, it is worth noting that the justifications raised by states in other cases have also been roundly rejected. As the Fourth Circuit noted in *Lux*, the argument that the circulator residency requirement serves the state's interest in "ensuring a threshold level of grassroots support" does not survive *Meyer* and *Buckley*, which held that that interest was adequately protected by the requirement that a certain number of residents *sign* the petitions. *Lux*, 651 F.3d at 403. Moreover, any purported interest in ensuring that "outsiders" do not influence Virginia's elections is simply illegitimate, because non-residents have a right to express their views to

---

[1] The defendants also claim that a residency requirement helps to "avoid[] the use of felons, children and illegal aliens as petition circulators." But this concern is more directly addressed by requiring circulators to certify that they are non-felons, at least eighteen years old, and U.S. citizens, and perhaps by providing criminal penalties for false certifications.

Virginia residents, and Virginia residents have a right to hear those views. *Krislov*, 226 F.3d at 866; *Lerman*, 232 F.3d at 152.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully urges the Court to grant the plaintiffs' motion for preliminary injunction.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INC.


_____/s/_____
Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union of
　　　Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080
(804) 649-2733 (fax)
rglenberg@acluva.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2012, I filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system, which will automatically serve an electronic copy on the following:

Hugh McCoy Fain, III
Edward Everett Bagnell , Jr
Maurice Francis Mullins
Spotts Fain PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
hfain@spottsfain.com
ebagnell@spottsfain.com
cmullins@spottsfain.com

James Edwin Trainor , III
Joseph Michael Nixon
Martin Douglas Beirne
Beirne Maynard & Parsons LLP
1300 Post Oak Blvd. 25th Fl
Houston, TX 77056
ttrainor@bmpllp.com
jnixon@bmpllp.com
mbeirne@bmpllp.com

Earle Duncan Getchell , Jr.
Wesley Glenn Russell , Jr.
Office of the Attorney General
900 E Main St
Richmond, VA 23219
dgetchell@oag.state.va.us
wrussell@oag.state.va.us

Charles Michael Sims
LeClairRyan, PC
PO Box 2499
Richmond, VA 23218-2499
charles.sims@leclairryan.com

John Christian Adams
Election Law Center PLLC
300 N Washington St, Suite 405
Alexandria, VA 22314
adams@electionlawcenter.com

                                                        /s/
Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union of Virginia Foundation, Inc.
530 E. Main St., Suite 310
Richmond, Virginia 23219
(804) 644-8080
(804) 649-2733 (fax)
rglenberg@acluva.org