

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

THE HONORABLE RICK PERRY,

                Plaintiff,

and

THE HONORABLE NEWT GINGRICH, THE
HONORABLE JON HUNTSMAN, JR., and
THE HONORABLE RICK SANTORUM,

                Intervenors,

v.                                Civil Action No. 3:11-CV-856-JAG

CHARLES JUDD,
Member of the Virginia State Board of Elections,
in his official capacity, *et al.*,

                Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the plaintiff and intervenor-plaintiffs' (collectively, the "plaintiffs") motion for a preliminary injunction. The plaintiffs are candidates seeking the Republican nomination for President of the United States. Under Virginia law, they failed to obtain the required number of petition signatures to place their names on the ballot for the Republican primary election. Now, they ask the Court for a preliminary injunction ordering that they be listed on the ballot. The plaintiffs argue that Virginia's rules limiting who can circulate candidate petitions and requiring 10,000 signatures violate the First and Fourteenth Amendments to the Constitution.

The equitable doctrine of laches bars the plaintiffs' request for a preliminary injunction. They knew the rules in Virginia many months ago; the limitations on circulators affected them as

soon as they began to circulate petitions. The plaintiffs could have challenged the Virginia law at that time. Instead, they waited until after the time to gather petitions had ended and they had lost the political battle to be on the ballot; then, on the eve of the printing of absentee ballots, they decided to challenge Virginia's laws. In essence, they played the game, lost, and then complained that the rules were unfair.

Ordinarily, the decision on laches would preclude further analysis of the case. The Court recognizes, however, that the parties may well seek appellate review of this matter. In order to allow a complete review on appeal, the Court will also analyze the merits of the plaintiffs' claims.

## I. Parties and Proceedings

The original plaintiff in this case is Rick Perry ("Perry"), a Republican candidate for the presidency. Three other Republican candidates have intervened as plaintiffs—Newt Gingrich ("Gingrich"), Rick Santorum ("Santorum"), and Jon Huntsman, Jr. ("Huntsman").

The defendants are Charles Judd, Kimberly Bowers, and Don Palmer, the members of the Virginia State Board of Elections (collectively, the "Board"). Pat Mullins ("Mullins"), Chairman of the Republican Party of Virginia, is also a defendant.

Perry filed this lawsuit challenging the petition requirements on December 27, 2011. Gingrich, Santorum, and Huntsman intervened on January 4, 2012. The Court ordered expedited briefing, and, on January 13, 2012, held an evidentiary hearing on the motion for preliminary relief.

The plaintiffs raise claims arising under the First and Fourteenth Amendments to the Constitution. They attack Virginia's rule that only people eligible to register to vote may circulate petitions for signatures to place a candidate on the ballot. The plaintiffs contend that

2

the limitation on who may seek signatures restricts their rights of free speech and association, because fewer people can advocate them as candidates.

The plaintiffs also challenge Virginia's statute requiring statewide candidates to obtain 10,000 signatures, including 400 from each congressional district, to secure a place on the ballot. They claim the number of signatures is too burdensome and, therefore, unconstitutional. Finally, the plaintiffs argue that Virginia's election procedures violate the Voting Rights Act.[1]

## II. Law Governing Preliminary Injunctive Relief

The requirements for preliminary injunctive relief are well established. Such relief is appropriate when the plaintiffs establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010). As the Fourth Circuit explained in *Real Truth About Obama*, *Winter* requires that the plaintiffs make a clear showing that they will likely succeed on the merits at trial. *Real Truth About Obama, Inc.*, 575 F.3d at 346.

The traditional purpose of a preliminary injunction is to prohibit an action. Preliminary injunctions are meant to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). Mandatory injunctive relief, however, alters the status quo by commanding or requiring a party

---

[1] The Court will focus on the facts relating to, and the legal sufficiency of, the residency and voter eligibility requirements and requisite number of signatures, as the plaintiffs seek a preliminary injunction based on their constitutional claims only. The plaintiffs do not seek preliminary relief on their claim under the Voting Rights Act.

3

to perform a positive act.   In this case, the plaintiffs request that the Court require the Board to add their names to the primary ballot, which is a positive act that alters the status quo.   The Fourth Circuit has viewed mandatory relief with caution, explaining that it "should be granted only in those circumstances when the exigencies of the situation demand such relief." *Id.* at 526 (citing *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)).   "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Id.*

Laches is an equitable doctrine that precludes relief when a plaintiff has delayed bringing suit to the detriment of the defendant.   The doctrine applies with particular force in the context of preliminary injunctions against governmental action, where litigants try to block imminent steps by the government.   "Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public . . . projects do so with haste and dispatch." *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); *see Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 100-01 (W.D. Va. 2007) (delay in bringing suit is a factor to be considered in granting preliminary relief); *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) ("The Fourth Circuit is especially mindful of laches in the context of an impending vote.").

### III. The Virginia Statutory Scheme

The Virginia Code grants to the Board the authority to make rules and regulations and provide information consistent with election laws.   *See* Va. Code § 24.2-103(A).   Under Va. Code § 24.2-545, the Board has the responsibility to create the form for receiving primary petition signatures.   The form prescribed by the Board requires petitions to be collected after July

4

1, 2011.  Significantly for this case, the petition must be circulated by a registered voter or someone eligible to vote in Virginia, who signs the petition in the presence of a notary.[2]

The candidate must file petitions with the Board signed by at least 10,000 qualified voters, including at least 400 qualified voters from each congressional district in Virginia, who attest that they intend to participate in the primary.  *See* Va. Code § 24.2-545(B).  All presidential candidates seeking the nomination of a national party must also complete a Consent/Declaration Form, formally certifying their desire to run in Virginia.

Thereafter, the Board turns the petitions over to the party conducting a primary.[3]  The party then certifies to the Board which candidates have qualified to appear on the presidential primary ballot.  Finally, the Board conducts a drawing to determine the order in which the names appear on the ballot.

## IV. Statement of the Material Facts

All parties have filed extensive memoranda supporting their respective positions.  The Court heard oral argument and conducted an evidentiary hearing on the preliminary injunction motion.  The parties have also agreed that the Court should consider the affidavits and exhibits filed with the Court.  Based on the evidence presented, the Court has determined that the following narrative represents the material facts of this case for the purpose of resolving the motion.

The plaintiffs are candidates for the office of President of the United States.  Each plaintiff satisfies the requirements of the Constitution to be President of the United States.

---

[2] This requirement entails three separate limitations.  First, circulators must be of age to vote. Second, they must be Virginia residents.  Third, they much not be disqualified from registration by such things as felony convictions.

[3] Since no candidates have challenged President Obama, there will be no Democratic primary.

Perry declared himself a candidate for president on August 13, 2011. He filed his Statement of Candidacy with the Federal Election Commission on August 15, 2011. Perry signed and affirmed, in the presence of a notary as required by Va. Code § 24.2-545, his Declaration of Candidacy for the Commonwealth of Virginia on October 13, 2011. On December 22, 2011, Perry submitted to the Board petitions containing fewer than 10,000 signatures.[4] On December 23, 2011, Republican Party Chairman Mullins made a preliminary determination and publicly announced that Perry had not submitted enough petition signatures.

Gingrich declared his candidacy for the presidency on May 11, 2011. He filed his Statement of Candidacy with the Federal Election Commission on May 16, 2011, and submitted his Declaration of Candidacy for the Commonwealth of Virginia on December 22, 2011. On December 22, 2011, Gingrich also submitted his petition signatures. Gingrich claims that he submitted 11,050 signatures. The Board states that less than 10,000 of the submitted signatures were valid, but does not know the precise number of signatures submitted. On December 23, 2011, Mullins publically announced that Gingrich had not qualified to appear on the ballot.

Huntsman declared his candidacy for the presidency on June 21, 2011. He filed his Statement of Candidacy with the Federal Election Commission on June 28, 2011. Unlike Perry and Gingrich, Huntsman did not submit a Declaration of Candidacy in Virginia because he did not have the statutorily-required 10,000 signatures, and he therefore did not submit any petitions to the Board.

Santorum declared his candidacy for the presidency on June 6, 2011. He filed his Statement of Candidacy with the Federal Election Commission on June 6, 2011. The parties dispute whether Santorum submitted his Declaration of Candidacy. Santorum says that he

---

[4] Perry contends he submitted more than 6,000 signatures. The Board agrees that Perry submitted less than 10,000 signatures, but does not know the precise number he submitted.

submitted more than 8,000 signatures, but he claims the Board refused to accept his signatures because they did not meet the 10,000 threshold. The Board contends that Santorum did not submit any signatures. The unrebutted testimony, however, showed that Santorum tendered the petitions, but the Board turned them down.

Unlike the plaintiffs, two other Republican candidates, Mitt Romney and Ron Paul, complied with Virginia's rules and will appear on the ballot.

The plaintiffs offered evidence that, if they could have used non-residents to gather signatures, they would have met the 10,000 signature threshold. Each candidate had out-of-state people ready, willing, and able to come to Virginia to secure signatures. For instance, Joe Allbaugh, the national campaign chair for Perry, testified that Perry had thousands of out-of-state volunteers lined up to circulate petitions in Virginia. Blake Harris, the ballot access coordinator for the Huntsman campaign, testified that buses of college students in Washington, D.C. were available as petition circulators. Finally, Mark Tate, the Virginia ballot access coordinator for Santorum for President, listed five individuals who collected signatures in Virginia that were unable to be counted because of the residency restriction. On the other hand, Jerry Kilgore, the campaign manager for Perry in Virginia, testified that he collected over 13,000 valid signatures on a "shoe string" budget using friends and family members during the 1997 election for Attorney General of Virginia.

The Court takes notice that, as of December 31, 2011, Virginia had 5,134,825 registered voters. In Virginia's last statewide election,[5] 1,985,103 voters cast ballots.

In each Virginia locality, a local electoral board runs the election, following guidelines set up by the Virginia State Board of Elections. For each election, the State Board establishes a

---

[5] The 2009 gubernatorial election.

schedule of events designed to allow elections to proceed smoothly and in a timely manner. Under the schedule for the 2012 Republican primary, candidates could circulate petitions to obtain the 10,000 voters' signatures beginning on July 1, 2011. On December 7, 2011, party chairmen were to inform the Board whether the party would conduct a primary election. By December 22, the candidates were to submit their signature petitions and a declaration of candidacy, which the Board turned over to the party chairs. By December 27, the chairs were to certify the names of candidates qualified to appear on the presidential primary ballot. On December 28, the Board determined by lot the order the names would appear on the ballot.

No later than January 9, 2012, the local boards were to order paper absentee ballots from printing companies. The local boards have been instructed to mail out the absentee ballots on or before January 21, 2012. The primary is to occur on March 6, and the Board will announce the official results on March 20, 2012.[6]

On December 23, Mullins announced that Perry did not have enough petition signatures. Four days later, Perry filed the instant suit, seeking placement on the Virginia ballot.

### V. Discussion

The Court finds that the plaintiffs are not entitled to a preliminary injunction, for the reasons stated below.

### A. Laches

The parties have fully briefed the issue of whether laches bars the requested relief in this case. Undoubtedly, the only adequate remedy in this case is to include any harmed individuals on the ballot for the Virginia Republican primary election. But the plaintiffs have waited too long to request such relief.

---

[6] Other deadlines deal with registration to vote, return of absentee ballots, and voting before the election in-person in the local registrar's office. These matters are not at issue in this case.

Laches is an affirmative defense to claims for equitable relief. *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990), *cert. denied*, 501 U.S. 1260 (1991); *see Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980), *cert. denied*, 449 U.S. 919 (1980). In essence, the doctrine "penalizes a litigant for negligent or willful failure to assert his rights." *Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972); *Stoddard v. Quinn*, 593 F. Supp. 300, 308-09 (D. Me. 1984). Laches can serve as a defense to First Amendment claims. *See, e.g.*, *Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d 575, 579 (S.D. W. Va. 2000) (noting that "the loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 353 (1976))); *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 631 (S.D.N.Y. 1989) (suggesting that, in appropriate circumstances, laches could bar First Amendment claims).

Laches requires the proof of two elements: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *Marshall*, 921 F. Supp. at 1493-94; *see Costello v. United States*, 365 U.S. 265, 282 (1961); *White*, 909 F.2d at 102. As stated by the Fourth Circuit in *White*, the first element of laches is lack of diligence, when "the plaintiff delayed inexcusably or unreasonably in filing suit." *White*, 909 F.2d at 102 (citing *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987)); *see also Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 (5th Cir. 1985) (laches found where "delay is not excusable"); *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966) (laches found where "inexcusable or inadequately excused delay"). An inexcusable delay can only occur after the plaintiff discovers or should have discovered the facts giving rise to his cause of action. *See Knox v. Milwaukee Cnty Bd. of Elections Comm'rs*, 581 F. Supp. 399, 402 (E.D. Wis. 1984); *Ward v. Ackroyd*, 344 F. Supp. 1202, 1212 (D. Md. 1972).

9

The second element is prejudice to the defendant. *See White*, 909 F.2d at 102. The defendant must prove that he has suffered a disadvantage or some other harm caused by reliance on the plaintiff's conduct. *Id.* (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982)). Prejudice can be inferred simply from the plaintiff's delay, or from evidence of specific harm. *Id.* The greater the delay, the less the prejudice required to show laches. *Id.*

In this case, the plaintiffs were permitted to collect the requisite signatures for ballot access between July 1, 2011 and December 22, 2011. On December 22nd and 23rd, the plaintiffs were denied positions on the Virginia Republican primary ballot for failure to comply with the signature requirements of Va. Code § 24.2-545(B). On December 27, 2011, this suit commenced. Central to the plaintiffs' argument against laches is their contention that an injury-in-fact did not arise until December 22nd and 23rd, when they were denied a place on the ballot. They argue that they "timely sought relief at a time actual injury occurred" and "[t]o have brought this suit before they were declined a position on the ballot would have only presented the court with a hypothetical issue and subjected the claim to a ripeness defense." (Br. of Intervenors 4.) The Court disagrees.

Here, the plaintiffs claim a loss of their First Amendment rights of free speech and association. Any injury arose when the Commonwealth limited the categories of people who could spread their message, by banning petition circulators from out-of-state. The first day the plaintiffs were unable to communicate their message effectively was the first day they could circulate petitions. As of that date, they could have brought in an army of out-of-state circulators to persuade people to sign petitions and, ultimately, vote for them. Huntsman, Gingrich, and Santorum declared their candidacies before July 1, 2011; thus, the first day they could have used

10

out-of-state circulators was July 1. Perry declared his candidacy on August 13, 2011, and suffered injury from that date forward. Yet, the candidates waited almost half a year before seeking judicial relief. As to the first element of laches, therefore, the Court finds that the plaintiffs displayed an unreasonable and inexcusable lack of diligence.

This lack of diligence has significantly harmed the defendants. The Board established a reasonable, necessary, and comprehensive schedule of tasks leading to the primary election. Among those tasks is the printing of absentee ballots. To comply with federal law, absentee ballots must be distributed on or before January 21, 2012.[7] To meet this deadline, the Board set a timetable for the localities to design ballots, order them from printers, proofread mock-ups, receive them, and mail them out. By January 13, 2011, the date of the preliminary injunction hearing, the local boards should have received absentee ballots, and begun the process of mailing them out. The filing of this suit, however, has changed the Board's careful scheduling into a chaotic attempt to get absentee ballots out on time. This alone amounts to damage that satisfies the laches requirements. *See Marshall*, 921 F. Supp. at 1494 ("The time element is most important . . . . Under the delay/prejudice ratio, prejudice need not be so severe where, as here, delay is conscious and substantial."). Don Palmer, the Secretary of the State Board of Elections, testified without contradiction that printing ballots is complex and requires a number of technical steps to imbed information into the ballots themselves and to program computers to count them. He also testified that, as of this date, absentee ballots cannot be prepared before they must be available.

But there is another, more fundamental injury caused by the plaintiffs' delay. Virginia insists that candidates secure 10,000 signatures of registered voters. *See* Va. Code § 24.2-

---

[7] *See* Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 42 U.S.C. § 1973ff-1(a)(8)(A).

545(B). This requirement serves the valid purpose of limiting ballot access to candidates with a modicum of support and a viable chance in the election. Fringe candidates and crackpots have the potential to complicate needlessly both the ballot and the counting of votes. The 10,000 signature requirement is plainly constitutional (as discussed below), and the number of signatures required is not asserted as a ground for preliminary relief.

None of the plaintiffs have secured 10,000 valid signatures. They ask the Court to order their inclusion on the ballot without having secured the requisite number to show they are viable candidates. The Commonwealth has the right to demand a show of legitimate strength among the electorate. Had the plaintiffs brought suit in a timely fashion, the Court could have allowed the use of non-resident circulators, and the plaintiffs might have been able to muster the required show of support. As it stands now, however, the Court can only speculate whether they would have been placed on the ballot. It is too late for the Court to allow them to gather more signatures—the absentee ballots must go out now.

Accordingly, the Court finds that the plaintiffs have slept on their rights to the detriment of the defendants. The motion for a preliminary injunction is barred by laches.

\* \* \*

As noted above, the decision on laches resolves the motion. To allow the parties a complete review on any appeal, however, the Court will address the other issues raised by the parties.

### B. Standing

Article III standing is a fundamental jurisdictional requirement that defines and limits a court's power to resolve cases and controversies. *Miller v. Brown*, 462 F.3d 312, 316-21 (4th Cir. 2006); *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 298 (4th Cir. 2005). Standing

12

requires that a litigant have a personal stake in the outcome of a controversy as a result of having suffered some actual or threatened injury. *Kay v. Austin*, 621 F.2d 809, 811 (6th Cir. 1980) (citing *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)); *see Warth v. Selden*, 422 U.S. 490, 498-501 (1975). Accordingly, a litigant must demonstrate: (1) a distinct and palpable injury, (2) a fairly traceable causal connection between the claimed injury and the challenged conduct, and (3) a substantial likelihood that the injury is redressable by the relief requested. *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72, 75 n.20 (1978).

The defendants claim that the plaintiffs lack standing because they do not have 10,000 signatures, and therefore may not appear on the ballot. This disingenuous argument confuses a decision on the merits with standing. Here, the plaintiffs contend that they do not have 10,000 signatures because of the Commonwealth's unconstitutional rules. They allege two distinct elements of injury: the inability to speak through non-Virginians, and the consequent failure to secure enough signatures to get on the ballot. These contentions satisfy the Article III standing requirement.

## C. Likelihood of Success on the Merits— Argument Under State Law that the Statute Is Permissive

The plaintiffs contend that they really do not need to comply with the requirement to submit 10,000 signatures to the Board, claiming that the filing of petitions is permissive, based on the use of the word "may" in the statute: "Any person seeking the nomination of the national political party for the office of the President of the United States . . . *may* file with the State Board petitions signed by at least 10,000 qualified voters . . . ." Va. Code § 24.2-545(B) (emphasis added). This argument is without merit. Clearly, the statute means that a candidate "may" want to run for election in Virginia's primary. If he does so, he needs to comply with the

requirements of the statute, all of which are stated as things that "shall" be done. There is no question that they are mandatory. For decades, Virginia has enforced them as mandatory.

The plaintiffs' argument renders the remainder of the section so much surplus language. Common sense and principles of statutory construction counsel against rendering a statute meaningless. As the Virginia Supreme Court has stated, "[A] statute should never be construed in a way that leads to absurd results." *Meeks v. Commonwealth*, 274 Va. 798, 802, 651 S.E.2d 637, 639 (2007) (citing *Washington v. Commonwealth*, 272 Va. 449, 455, 634 S.E.2d 310, 313 (2006)). The Court recognizes that Va. Code § 24.2-545(B) does not mean that each and every person running for President of the United States is required to submit petitions to the Board; it does mean that those who choose not to submit petitions to the Board cannot appear on the ballot in the Virginia primary.

### D.  Likelihood of Success on the Merits—Residency Requirement

The authorities make clear that circulating petitions for candidates is a form of protected speech, and that the Commonwealth has a heavy burden to justify the restriction on speech by showing not only that the limitation achieves a compelling state interest, but also that the limitation is no broader in scope than necessary to achieve that purpose. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999); *Lux v. Judd*, 651 F. 3d 396 (4th Cir. 2011). In the context of the First Amendment, the Court must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192 (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)). The Supreme Court's decision in *Buckley* is instructive and guides the Court's analysis in the instant matter. In *Buckley*, the Supreme Court struck down a Colorado regulation that required circulators for petitions of ballot

14

initiatives be registered voters, holding that the requirement "cuts down the number of message carriers in the ballot-access arena without compelling cause." *Id.* at 197.

The Court recognizes that *Buckley* did not address the precise issue before the Court: whether the residency requirement should be upheld. The Supreme Court expressly did not address the residency requirement of the Colorado statute. *See id.* at 645 ("assuming that a residence requirement would be upheld as a needful integrity-policing measure—a question we, like the Tenth Circuit, have no occasion to decide" (internal citation omitted)). Since the Supreme Court's decision in *Buckley*, however, the weight of decisions from courts of appeals have held residency requirements to be unconstitutional.

In *Lux v. Judd*, the Fourth Circuit addressed a similar residency requirement under Virginia law. 651 F. 3d 396 (4th Cir. 2011). *Lux* involved a would-be congressional candidate. Virginia law requires such candidates to secure signatures on petitions, and, similar to the instant case, the petition circulators must be residents of the district in which the candidate wants to run. This Court upheld the residency requirement in granting a motion to dismiss. The Fourth Circuit reversed, and remanded the case for this Court to review in light of *Buckley* and *Meyer*. Specifically, the Fourth Circuit held that, considering *Buckley and Meyer*, a challenge to a residency requirement states a plausible claim. The Court of Appeals directed this Court to assess independently the state interests served by the residency requirement and then determine whether the requirement unduly restricts the candidate's First Amendment rights. Without expressly saying so, the Fourth Circuit has essentially indicated that this Court should apply strict scrutiny to the residency requirement. Given the outcome of *Buckley*, the state rule is highly unlikely to withstand the First Amendment challenge.

15

Directly on point is *Nader v. Brewer*, in which the Ninth Circuit struck down an Arizona law that required petition circulators to be residents of the state.  531 F.3d 1028 (9th Cir. 2008). The court extended *Buckley* to voter eligibility and residency requirements.  The Ninth Circuit found that, despite the "millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support a candidate but who, like Nader himself, live outside the state of Arizona." *Id.* at 1036.  The Ninth Circuit held that the restriction "create[d] a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights." *Id.*; *see also, e.g., Yes on Term Limits v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (striking down a statute banning the use of non-resident petition circulators in Oklahoma's initiative and referendum process); *Chandler v. City of Arvada*, 292 F.3d 1236 (10th Cir. 2002) (striking down a regulation prohibiting nonresidents from circulating initiative, referendum, or recall petitions); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) (striking down a statute requiring circulators of nominating petitions to be registered voters in the political subdivision in which the candidate is seeking office ). *But see Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (upholding state residency requirement for ballot initiative petition circulators).[8]  The Court agrees with the rationale in *Brewer*.  As in *Brewer*, the restriction before the Court is less restrictive than those before the Supreme Court in *Buckley*. Yet, the rationale is the same: the provision limits the number of voices who can convey the candidates' messages, thereby reducing "the size of the audience [the candidates] can reach." *Buckley*, 525 U.S. at 194-95.

---

[8] As Chief Justice Roberts observed in an appeal of the *Lux* decision to him sitting as a circuit justice, a split of authority exists in the circuits about residency requirements.  In light of *Buckley* and *Meyer*, the Court believes that the split will be resolved against the validity of such requirements.

The First Amendment places a premium on political speech, especially speech about elections for public office. The drafters fashioned the First Amendment "'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Krislov v. Rednour.* 226 F.3d 851, 858 (7th Cir. 2000) (quoting *Roth v. United States,* 354 U.S. 476, 484 (1957)). By imposing a state residency requirement on petition circulators, the Commonwealth reduces the quantity of such speech available to its residents, and directly infringes upon the First Amendment rights of candidates, voters, petition circulators, and political parties. Of course, the boundaries of the First Amendment are not endless: if the Board can prove that it has a compelling state interest for the residency requirement, and that the requirement is narrowly tailored to serve that compelling state interest, then the regulation will stand. *See Republican Party of Minn. v. White,* 536 U.S. 765, 774-75 (2002).

To withstand strict scrutiny, the Commonwealth must establish that the challenged statutes are narrowly tailored to promote a compelling state interest. The Board has offered no evidence that allowing non-residents to circulate petitions increases the instances of fraud. Moreover, the Court is not persuaded that such an argument is valid, as multiple courts have rejected the idea that non-residents are inherently less honest. *See, e.g., Brewer,* 531 F.3d at 1037; *Yes on Term Limits,* 550 F.3d at 1029.

The Board contends that the residency requirement is necessary to protect the Commonwealth's ability to subpoena petition circulators. *Brewer* and *Yes on Term Limits,* among other decisions, have stated that such an interest is not narrowly tailored, as states could require circulators to submit to the state's subpoena power before becoming a circulator. The Board has done nothing to demonstrate how such a requirement would fail, beyond stating that "direct subpoena authority is more effective than an undertaking to be subject to out-of-state

17

jurisdiction." Moreover, the Court is skeptical that subpoena power over out-of-state circulators is a compelling state interest—the critical signature on the petition is not that of the circulator, but that of the voter. Registered voters, by definition, are Virginia residents and subject to whatever examination the authorities deem necessary.

For these reasons, the Court believes that the residency requirements for petition circulators will likely be declared unconstitutional, and that the plaintiffs will ultimately prevail.[9]

### E. Likelihood of Success on the Merits—10,000 Signature Requirement

In Count II of their Complaint, the plaintiffs argue that the 10,000 signature requirement of Virginia Code § 24.2-545 is unconstitutional as unreasonably burdensome. They do not argue this position in their brief in support of the motion for a preliminary injunction, and with good reason: they are not likely to prevail on this issue.

States have an important interest in "requiring some preliminary showing of a significant modicum of support" before printing a candidate's name on the ballot, so as to "avoid[] confusion, deception, and even frustration of the democratic process at the general election." *Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. N.Y. 1999) (citing *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)); *see Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). Moreover, the states "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." *Clements v. Fashing*, 457 U.S. 957, 965 (1982). The pertinent question becomes, therefore, whether, given the totality of the circumstances, a reasonably

---

[9] Given the Court's finding that Perry is likely to succeed in establishing that the residency requirement is unconstitutional, the Court finds that the more restrictive component of the provision, that petition circulators be eligible voters, is likely to fall as well.

diligent candidate could be expected to meet the signature requirement or whether the statute is excessively burdensome. *See Storer v. Brown*, 415 U.S. 724, 738-40 (1974); *Fishman v. Schaffer*, 418 F. Supp. 613, 615 n.4 (D. Conn. 1976).

Numeric requirements for ballot access have consistently been upheld, including ones much more onerous. *See, e.g., Storer*, 415 U.S. at 726-27 (5% of vote cast in previous general election); *Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974) (22,000 signatures); *Jenness*, 403 U.S. at 438-39 (5% of eligible voters); *Rainbow Coal. of Okla.* v. *Okla. State Election Bd.*, 844 F.2d 740, 741 (10th Cir. 1988) (5% of votes cast); *Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985) (2% requirement upheld); *Libertarian Party of Florida v. Florida*, 710 F.2d 790 (11th Cir. 1983) (3% requirement upheld); *Rosen v. Smith*, No. 92 Civ. 5880, 1992 WL 209290 (S.D.N.Y. Aug. 18, 1992) (10,000 signatures requirement upheld for U.S. Senate primary); *see also Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997) (relying on *Jenness* and upholding 5% signature requirement); *Hewes v. Abrams*, 718 F. Supp. 163, 167 (S.D.N.Y. 1989) ("Under *Jenness* a standardized 5% signature requirement would be constitutional . . . ."), *aff'd*, 884 F.2d 74, 75 (2d Cir. 1989) ("affirming substantially for the reasons stated by" the district court);

Virginia's requirement of 10,000 signatures is a minimal number. It represents 0.2% of the Commonwealth's registered voters. It is only 0.5% of the voters who turned out in the last statewide election. No one can seriously argue that the rule is unduly burdensome. Six candidates made the same ballot four years ago under the same rules. *See* Virginia State Board of Elections, Official Results: 2008 February Republican Presidential Primary, http://sss.sbe.virginia.gov/cms/documents/ElectionResults/Feb12_RepublicanPrimary.pdf. The 10,000 signature requirement serves the state's legitimate interest in ensuring a fair and orderly

election.[10]  *See Anderson*, 460 U.S. at 788 ("'[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes'").

The Court finds that the plaintiffs are not likely to prevail on their challenge to the 10,000 signature requirement.   The Court, therefore, cannot fashion relief that does not include compliance with the 10,000 signature requirement.

### F. Irreparable Harm in the Absence of Preliminary Injunctive Relief

Pursuant to *Real Truth About Obama*, in addition to establishing that they will likely succeed on the merits, the plaintiffs must also establish that they will suffer irreparable harm in the absence of preliminary relief.  The plaintiffs have met this standard.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Newsom v. Ablemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (citations omitted).  The plaintiffs are presidential candidates, and in the absence of preliminary relief, they will have no chance to secure the delegates from Virginia at the Republican convention.  The harm to them would obviously be irreparable.

### G. Balance of the Equities

---

[10] The plaintiffs urge the Court to apply strict scrutiny in analyzing the constitutionality of the 10,000 signature requirement.   They claim the signature requirements are sufficiently burdensome to require a heightened standard.  *See Clements*, 457 U.S. at 964 (noting the appropriate inquiry is "whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." (internal citation omitted)); *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The Court disagrees. Because the requirement of 10,000 signatures is not unduly burdensome, the defendants need only proffer a rational basis in order for the regulation to survive a constitutional attack.  *Rosen v. Smith*, No. 92 Civ. 5880, 1992 WL 209290, at *3 (S.D.N.Y. Aug. 18, 1992) (citing *Unity Party v. Wallace*, 707 F.2d 59, 63 (2d Cir. 1983)); *see Tarpley v. Salerno*, 803 F.2d 57, 60-61 (2d Cir. 1986).  In this case, a rational basis is found in Virginia's legitimate interest in ensuring a fair and orderly election as well as the state's interest in keeping frivolous candidates off the ballot.  *Rosen*, 1992 WL 209290, at *3. In any event, even under the strict scrutiny standard the Court would find the signature requirement valid.

A mandatory preliminary injunction requires another party to perform a positive act; in this case, the plaintiffs request the Court to order the placement of their names on the Republican primary ballot. The Court recognizes that this type of relief alters the status quo and should be treated with caution. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The Court also recognizes the imminence of the primary, potential for voter confusion, increased expense, and a potential disruption of the electoral process if preliminary relief were to be granted.

Further, the Court appreciates the seriousness of a federal court intervening in the state electoral process. As this case shows, federalism is often espoused in principle, but abandoned in convenience. Nonetheless, as Perry's lawyers have correctly argued, federalism concerns do not obviate the need to comply with the Constitution, and the Court must decide this matter.

An injunction enjoining the Commonwealth from enforcing a regulation that the Court has determined is likely to be found unconstitutional cannot qualify as harm. *See, e.g., Newsom*, 354 F.3d at 361. The Court therefore finds that the balance of equities tips in favor of the plaintiffs.

## H. Whether an Injunction Is in the Public Interest

The public interest weighs heavily in favor of the plaintiffs. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Although the public can and should rely on the Board for a smooth, machine-like operation of the electoral process, the public interest more closely lies with the voter's ability to cast a ballot for the candidate of her choice. This factor also weighs in favor of granting preliminary relief.

* * *

21

To summarize, the Court finds that, except for the doctrine of laches, the plaintiffs would be entitled to the relief they seek. Had the case been timely filed, the Court would have ordered the defendants not to enforce the residency requirement for petition circulators, and the plaintiffs could have tried, with the expanded pool of campaign workers, to get the 10,000 signatures.

## VI. Conclusion

In sum, the Court finds that the plaintiffs' motion for a preliminary injunction must be denied. The plaintiffs have waited too long to file, and the doctrine of laches bars their claim. The Commonwealth is far along in the electoral process. The primary election is so close that the plaintiffs cannot gather the requisite signatures to get on the ballot. To place the plaintiffs on the ballot would deprive Virginia of its rights not only to conduct the primary in an orderly way but also to insist that a candidate show broad support.

Had the plaintiffs filed a timely suit, the Court would likely have granted preliminary relief. They are likely to prevail on the constitutionality of the residency requirement, and, had they filed earlier, they would have been able to obtain the requisite 10,000 signatures. The Court would find that the plaintiffs satisfy the other requirements for preliminary relief.

For the reasons stated above, the motion for a preliminary injunction is denied.[11]

The Court will enter an appropriate order.


Date: January 13, 2012
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[11] Given the Court's ruling, the motion for a temporary restraining order is moot and will be denied.

22